Caroline K. Simon, J.
Eonte 6, well-travelled east-west main traffic artery, passes through the Town of Yorktown which is a rapidly growing residential area in suburban Westchester County. The New York State Department of Public Works has recognized the urgent need for modernization and widening of this thoroughfare due to its increased usage by the larger population of the many local communities it serves. As part of the implementation of this reconstruction program, properties adjoining Eoute 6 were acquired by the State in proceedings of which the two instant claims, located in the Jefferson Valley area, form a part.
Ernest L. Fracchia filed two claims against the State of New York; one, assigned Claim No. 44352 for the permanent appropriation of ,563 acre of land, and the other for the appropriation *26 of an. easement of access, which was assigned Claim No. 46367. Each taking was for the project known as Peekskill-Putnam County Line, Westchester S. H. 1309, pursuant to section 30 of the Highway Law as amended. By agreement of the parties, both claims were tried together. This decision incorporates awards for each claim.
Map 91 was filed in the Westchester County Clerk’s office on March 1, 1963. It depicts Parcels 160 and 161, the taking of which constitutes Claim No. 44352. The parties have stipulated the filing date to have been the date of taking.
Map 123, Parcel 215, was filed in the Westchester County Clerk’s office on June 11, .1965, on which date it was stipulated claimant’s easement of access was extinguished.
The Clerk of the Court of Claims and the office of the Attorney-General each acknowledged receipt and filing of Claim No. 44352 on October 2, 1964, and receipt and filing of Claim No. 46367 on March 30, 1966. Neither claim has been assigned nor submitted to any other court or tribunal for audit or determination.
The court adopts the maps and descriptions of the appropriated properties as shown on the maps and descriptions filed in the Westchester County Clerk’s office, copies of which are attached to each claim, and the same are incorporated herein by reference.
■Claimant submits proof of ownership of the property by means of:
1. Photostat of a bargain and sale deed dated March 15, 1955 between Laura Smith Bohrer, grantor, and Ernest L. Fracchia and Conrad Martens as tenants in common, grantees. This instrument was recorded in the Westchester County Clerk’s office on March 16, 1955 in Liber 5434 at pages 13 through 15.
2. Photostat of a bargain and sale deed dated September 1, 1960, between Conrad Martens, grantor, and Ernest L. Fracchia, grantee, recorded in the Westchester County Clerk’s office on October 26, 1960 in Liber 6059 at pages 176 through 178.
Before the appropriation, claimant’s property consisted of an oblong-shaped parcel of land of 35.595 acres with an average depth of 2,450 feet, extending perpendicularly northward from the north side of Route 6, on which it fronted for a distance of 221.77 feet according to claimant, and 220.94 feet according to the 'State. The court adopts claimant’s figure since it was based upon the same survey as that which the State adopted in stipulating to the total acreage.
There was a. gradual rise or slope toward the rear of the lgnd? which was bounded by the Putnam County line. The *27 property adjoined lands of the Taconic State Parkway to the west. The land was partially wooded and entirely vacant, unimproved and undeveloped at the time of the taking. It was located in R 1-20 residential zone of the Town of Yorktown, which zoning permitted single-family dwellings on minimum plots of 20,000 square feet, with a minimum width and depth of 100 feet. This zoning designation also permitted the construction of churches, schools, parks, etc. The area surrounding claimant’s property has been growing rapidly and large numbers of residential subdivisions have been developed close to subject property.
Claimant himself testified that he had been in the business of land development for many years, and that he had purchased this property in 1955 as an investment for residential subdivision, although at the taking date no subdivision map had as yet been filed.
The parties agree, and the court finds, that the highest and best use of this property, both before and after the taking, was for residential subdivision development in conformity with the zoning ordinance, although claimant’s expert contends that its use for this purpose was sharply curtailed by reason of the appropriation.
Claimant’s appraiser, though he considered market data, income and cost approach methods for his appraisal, determined after study that only the market data approach was suitable, and analyzed a group of comparable sales, adjusting them to allow for their individual differences from the subject property. He arrived at a before-value of $107,000 for the subject property, appraising it as bulk residential land at $3,000 an acre. He assessed the direct damage resulting from the taking of Parcel 160 (.156 acre) and Parcel 161 (.407 acre) of Map 91 as $1,700 at his before-value rate of $3,000 per acre. To this sum he added consequential damages of $87,800, as having been caused to the remaining 35.032 acres at a rate of $2,500 per acre, thus arriving at a total damage figure of $89,500.
He testified that the appropriation severely restricted entry onto the property, since the takings were all at the southwest portion of the property fronting on Route 6. He stated that the utility of the remainder thereafter became extremely limited for the purpose of subdivision development as residential building plots because of the loss of suitable access, and that the value of claimant’s property was thereby substantially reduced. He also pointed out that the property before the taking was contiguous to town water lines, but that after the taking it was 400 feet away from them and that the increased distance *28 necessary to pipe water would add to the development cost. There were no public sewers.
The State’s expert assessed the before-value of claimant’s property in two segments. He hypothesized a Route 6 building plot with 170 front feet by 200 feet in depth, or .782 acre, which he valued at $5,000. He then reserved another 50 feet of Route 6 frontage for interior access by means of a proposed service road, and valued the remaining 34.25 acres at $1,500 per acre, thus producing a total before-value of $56,400. Later in the trial, the State’s appraiser accepted the total acreage as being 35.595 acres. Although he did not thereafter change his before-value for the property, the court must assume that he would have increased it from $56,400 to $57,219.50.
The State’s appraiser also used the comparable sales approach in his evaluation. He agreed that the taking of Parcels 160 and 161 deprived claimant of frontage on Route 6, although he suggested that suitable access might he- provided by a service road that would terminate in the cul-de-sac at the extreme southeast corner of the remaining property. He acknowledged that there had been severance damage resulting from the taking. He set the direct damage figure at $6,400 per acre for the portion fronting on Route 6, or $2,000 for the .312 acre, and $1,500 per acre for the interior land taken, or $400 for the .251 acre, thus arriving at a total direct damage of $2,400, to which he added consequential damages of $2,300, thus producing a total damage figure of $4,700.
It is significant that the State’s appraiser described claimant’s land in his two written appraisals prepared in 1962 and 1965 as “ rising gradually to the rear” and “rolling woodland ”, though in the State’s explanation of the suggested use of the land the description used was “ rugged terrain” which would have required considerable expense to bring the road necessary for subdivision development through the front of the property prior to the taking.
An engineer employed by the New York State Department of Public Works to supervise highway construction for the State testified that the cul-de-sac or turn-around had been constructed by the Department of Public Works as a convenience for the adjoining property owners, of whom Mr. Fracchia was one, so as to provide them with a means of access to the new Route 6. The State, according to its witnesses, intends to turn the road and its cul-de-sac over to the Town of Yorktown at a date to be determined by agreement between the town and the State.
*29 . Upon cross-examination the engineer Avitness stated that a distance of about ,100 feet diagonally across Parcel 160 separated the edge of the circular turn-around from the nearest edge of claimant’s remaining land, and that the terrain sloped sharply from the north and west, Avith a topographical declivity of from 14 to 15 feet, constituting a 50% grade. Further, he admitted that it was highly unlikely that the Westchester County authorities would accept plans for a town road of that steep a grade to enter a State road. Upon redirect examination, however, he proposed a longer alternate direction for the access road which Avould not demand so steep a grade, but added that he was not familiar with the subsurface conditions nor did he know whether rock might be encountered in a road’s construction.
The State’s Besident Engineer for Northern Westchester County stated that the Department of Public Works considered a 2% grade to be the optimum desirable incline for roads entering State roads, and although permit applications for steeper grades had, upon occasion, been approved for other developments in that area, the Department’s current policy is not to waive the 2% requirement, and that he has no authority to do so. He admitted that a permit for building any road would be required.
The Town of Yorktown Engineer testified that subdivision roads with a grade of 15% had been approved during his seven years’ experience as Town Engineer, but that he knew of no permits having been granted for a steeper grade. He testified that the minimum and maximum grades of slope in Yorktown are guidelines which can be modified to meet terrain conditions. Since a road coming to the cul-de-sac would be joining a ramp to a major highway and not entering directly onto a major highway, approval of the road grade might be based upon modification of the usual rule. He also testified that such rule modification is often granted when steep terrain makes development according to precise rule impossible. He admitted that the town would not impose restrictions which would make it impossible to develop the property nor would they willingly sterilize land use. He added that to avoid such sterilization might even require town approval of road grades which were deviations from normal guidelines.
Claimant, after presenting his expert witness for direct and cross-examination, called to the stand a State’s expert present in the courtroom with a large roll of sketches. The expert, identified by claimant’s counsel’s examination as an. engineer, testified that he had been retained by the State to make a feasibility study of access to claimant’s property. His feasibility *30 study projected a subdivision designed to use a road from the cul-de-sac over the State’s land and into the potential subdivision.
Thereafter during the course of the trial] the State introduced into evidence a “stipulation” signed for the Superintendent of Public Works by the Assistant District Engineer, granting to Mr. Fracchia, his successors, heirs and assigns an unconditional right to use Parcel 160 for access into his property, and further providing that, should the State interfere with this right in futuro, claimant would have a new cause of action pursuant to Jafco Realty Corp. v. State of New York (18 A D 2d 74 [1963]).
Subdivision 18 of section 30 of the Highway Law states precisely the rule to be followed. No stipulation between parties can alter the legislative enactment prescribing the method to be used by the Superintendent of Public Works in disposing of public property. The terms of that enactment control the rights in relation thereto, and the methods listed do not include stipulations.
At its regular session, the 1967 Legislature passed, and the Governor of our State signed into law (approved and effective April 10, 1967 and to take effect immediately) as chapter 193, an amendment to section 10 of the Highway Law. That amendment added a new subdivision, 24-d, to the section, and adds to the duties of the Superintendent of Public Works the power, “ whenever such superintendent of public works deems it is necessary as a result of work of construction, reconstruction or maintenance of state highways, to provide for the re-establishment of private access to a public road where such access is destroyed by acquisition of right of way for the project. If such re-establishment of private access requires additional property or if it is necessary that such re-establishment of private access be made to other property, he may acquire such property as may be necessary for the purposes of this subdivision, in the same manner as other property is acquired for state highway purposes pursuant to this chapter, and he may enter into a written agreement with the owner of such private access to convey such property as deemed necessary for the purposes of this subdivision to such owner on terms beneficial to the state. The expense of such re-establishment of private access shall be a proper charge against funds available for the construction, reconstruction or maintenance of state highways, and such work may be performed by contract in the same manner as provided for state highways in article three of this chapter, or, by the use of departmental forces and equipment and of materials purchased therefor, or by a combi *31 nation of such methods. Upon the completion of the work, such re-established private access shall be maintained by the owners thereof.”
This added power is explicitly stated. The power could be applied in the instant situation, but no agreement between the Superintendent of Public Works and the claimant has been presented to the court. All that claimant or the court has been offered is the stipulation, to which reference has heretofore been made. The court finds that this does not meet the procedure of the statutory law either before or after the recent amendment.
The court therefore cannot accept the proffered stipulation as altering the condition in which claimant found himself after the State’s taking. It finds that the claimant was deprived of suitable access by the taking. 1 ‘ When the State files appropriation maps with a county clerk, it commits itself to an exercise of the power of eminent domain as completely as if it had filed a condemnation petition in the Supreme Court.” (Terrace Hotel Co. v. State of New York, 19 N Y 2d 526, 531.)
In the instant matter the filing of the maps instituted a chain of procedures, each of which is guided by law and rules. To mitigate claimant’s damage and re-establish his situation merely with the stipulation proffered by the State does not meet the legislative or legal requirements, so precisely stated as to permit no legal interpretation of them or any deviation therefrom. “ The question, then, becomes whether the price for which the owner could sell his property to some other person would be affected by the realized, probable, or possible damage in question. If the damage is too trivial, or if its significance would not be appreciated by a nondiscriminating buying public, or if its possible occurrence would not be thought of, or would not worry a buyer, it may properly be disregarded by the fact-finding body just as it would be disregarded in the market place. Otherwise it must be considered to the extent that the market would consider it, even if the market would tend to overcliscount its likelihood or seriousness.” (I Orgel, Valuation Under Eminent Domain, § 59, p. 268.)
The court is required to determine what a willing buyer would pay a willing seller at the taking date. It seems logical and likely that a purchaser’s price would be affected by doubts as to whether the State would .approve in a legally binding way the developer’s road plan. Considerable additional development cost because of deprivation of access to Route 6, available before the taking, and increased distance from water lines and the uncertainties in use, would make purchasers reluctant to buy, except at a bargain price. Because of these factors the coqrt *32 finds consequential damages to the property resulted from the taking.
The consequential damages awarded do not include any sum for circuity of access,» as this is not compensable under the law. (See Selig v. State of New York, 10 N Y 2d 34; Crear v. State of Neto York, 2 AD 2d 735; National Biscuit Co. v. State of New York, 12 A D 2d 998, vacated and mod. 14 A D 2d 729, affd. 11 NY 2d 743, cert. den. 370 U. S. 924.).
The court’s award is based on an evaluation of the land as vacant acreage enhanced by the potentiality of a higher use, the possibility and likelihood of being subdivided. “ The correct rule to be applied under the existing conditions was to treat the premises not as raw acreage nor as part of a completed development but as a potential subdivision site giving the acreage an increment in value because of that potential use.” Hewitt v. State of New York, 18 A D 2d 1128 [1963]. See, also, Barra v. State of New York, 22 A D 2d 750 [1964].)
Neither appraiser testified as to the increment added to their acreage valuation. They both found that the highest and best use of the property before and after the taking was increased by their evaluation of the land as a potential residential development .subdivision. The court finds, on all the evidence before it and its viewing of comparables and the property itself, that the acreage was worth $2,500 per acre before the taking, and the increment for potential subdivision added $500 per acre to that sum, making the acreage worth $3,000. (See Golden Park Realty Corp. v. State of New York, 28 A D 2d 605.)
After the first taking claimant had lost direct access to Route 6 but still had access over the right of way. Development of the subdivision would have been more difficult than before the taking but not so difficult as it became after the right of way was extinguished by the second appropriation which left claimant’s land without access.
“When, therefore, there is a destruction of the easement either by a direct taking of the easement itself or by a taking of the servient estate it has been said that the owner of the easement is damaged to the extent that the value of his dominant tenement ha.s been impaired by such taking.” (4 Nichols, Eminent Domain, § 12.41, subd. [1], p. 269.)
The court has viewed the subject property and the comparables submitted by both parties. It has weighed all the evidence, giving consideration to the testimony of the experts, but arriving at its determination independent of their valuations, and on the basis of its viewing of the property and the comparables.
*33 The court finds that the fair and reasonable market value of the subject property before the taking ivas $107,000; that the fair and reasonable market value of the subject property after the taking was $80,529.20 • and that the amount by Avhich claimant has been damaged is $26,470.80; of this amount $1,700 represents direct damage for the taking of .563 acre, $22,770.80 represents consequential damages to the remainder from the first taking, and $2,000 represents additional consequential damages to the remainder from the extinguishment of his easement of access due to the second taking.
The claimant is therefore entitled to an award in the sum of $26,470.80 for all damages, direct and consequential, with interest on $24,470.80 from March 1, 1963 to September 1, 1963, and from October 2,1964 to the date of entry of judgment herein, and with interest on $2,000 from June 11, 1965 to December 11, 1965 and from March 30, 1966 to the date of entry of judgment herein.