ROBERT W. NISHMAN, Respondent, v ANTHONY J. DE MARCO, JR., Appellant.

Second Department, July 14, 1980

APPEARANCES OF COUNSEL

*Fabian G. Palomino* for appellant.

*Sharfman, Shanman & Poret, P. C. (James A. Shanman* of counsel), for respondent.

## OPINION OF THE COURT

LAZER, J. P.

This appeal is the denouement of a fierce dispute between two lawyers who dissolved their 12-year-old partnership and now disagree as to what, if anything, was agreed upon with reference to the disposition of postdissolution partnership fees and expenses. In an action for an accounting of these fees, the plaintiff, Robert W. Nishman, has been successful in obtaining an interlocutory judgment directing an accounting. The defendant, Anthony J. De Marco, has challenged the interlocutory judgment contending that Special Term was in error when, in a written decision after trial, it (1) found that what had been agreed upon by the parties was an equal division of postdissolution fees, and (2) refused to dismiss the complaint on "clean hands" considerations. Since the parties had agreed at the outset of the accounting trial to limit the issue to whether a fee sharing agreement existed, there are before us factual issues relative to the agreement and the legal question of whether equity litigants can stipulate the clean hands doctrine out of a case. We conclude that an affirmance is required.

### I

Created with a handshake in June, 1962, Nishman & De Marco existed for 12 years without the benefit of a written partnership agreement with De Marco furnishing services as a trial attorney and Nishman acting as the "office man". Until the dissolution of the firm on July 1, 1974, the partners' draw was equal.

After July 1, 1974, the ex-partners continued in joint occupation of their office suite until their lease expired on September 30, 1975. For partnership fees received during that interim period, it is not disputed that the parties agreed to divide fees equally. New business was to belong to the attorney who obtained it or whomever the clients sought out.

Following termination of the lease and the parties' physical separation, De Marco did not remit to Nishman 50% of fees received on partnership matters closed out after September 30. In some cases, the sum he forwarded was less than 50% of the fee, while in others he sent nothing. De Marco's original

response to the instant accounting action was a denial of the allegations of the complaint and the interposition of a counterclaim for an accounting of fees collected by Nishman after July 1, 1974. On this appeal, De Marco asserts that the counterclaim was withdrawn by him during an in-chambers discussion with the Trial Justice's clerk prior to trial. Although the claim of formal withdrawal is unsupported in the record, the counterclaim clearly was abandoned at trial.

As the trial commenced, counsel for both parties stipulated that its first phase would "be concerned only with the issues of what the parties' agreement was" and if, at the close of the liability portion of the trial, a question concerning any sum due to plaintiff still existed the litigants would attempt to stipulate to the amount. Thus, if plaintiff was successful in establishing his right to an accounting, the need for an accounting trial would be dispensed with.

The focus of the trial was upon the parties' conflicting contentions concerning the existence of a fee and expense sharing agreement. Nishman, who was his only witness, testified that the post-September 30 separation worked no change in the parties' agreement to apportion fees equally. Upon their separation, the two former partners divided the case files on the basis of readiness for trial; the ready cases went to De Marco, otherwise the partner responsible for the original referral took it. To support his claim that fees were to be shared equally, Nishman introduced a letter from De Marco dated March 4, 1976—six months after the separation—in which the latter wrote:

"In addition, you have certain files which have been closed but fees were undistributed as yet. *Please provide me with a breakdown of the amount of settlement, expenses, net fee and share which you expect to distribute to me.*

"You are hereby authorized to retain any expected fee to be paid to me as a set-off against any fee to be paid to you out of the proceeds of any file retained by me. *I am prepared to distribute your share of the Soriano fee upon receipt of your statement of fees due me."* (Emphasis supplied.)

The letter evoked no response from Nishman. At the close of his case, both parties stipulated that partnership fees received between July 1, 1974 and September 30, 1975 had been divided equally.

In contradiction of Nishman's assertions, De Marco testified

that the apportionment of files depended upon which of the partners had brought the matter in originally and that the understanding was that after September 30, 1975, neither lawyer retained any interest in the files of the other. According to De Marco, this division and the disposal of the firm's physical assets had accomplished an informal accounting between the parties. None other was necessary.

To establish that no agreement for equal sharing of fees existed, De Marco introduced checks and bank records relating to the Nishman & De Marco accounts over which plaintiff had control. These indicated that after September of 1975 Nishman drew for his own use 95% of the funds he deposited while defendant drew no checks on the account after the dissolution. De Marco declared that Nishman made only a single remittance to him—a 50% share of the fee in four cases —and this occurred after the suit had begun. Letters in which De Marco had requested a 50% payment for expenses on partnership cases were explained by noting that the particular expenses involved were incurred between July 1, 1974 and September 30, 1975, while the parties were still bearing them equally.

Questioned concerning the circumstances of the March 4 "set-off" letter, De Marco explained that it was written after plaintiff had requested a similar breakdown of cases from him. Thus, "[w]hen I said to him, you are authorized to retain any collected fee to be paid to me as a set-off against any fee to be paid to you, out of the proceeds of any file retained by me, I expected that he would give me a breakdown. And to the extent that he did work on the file, *which warranted him retaining part of the fee,* and giving it—part of it to me because of the work that was done on the file which was completed before he took it, that I would give him a part of my fee for cases where he performed any work on the part of the file that I retained." (Emphasis supplied.)

During cross-examination, De Marco varied his account of the parties' intentions concerning post-September 30 fees. In response to pretrial interrogatory number 1, which required that he set forth "the substance of each agreement, whether written or oral, between you and plaintiff" regarding division of fees received after June 30, 1974 on account of "partnership matters", De Marco had responded: "Plaintiff and defendant divided the partnership files as of July 1, 1974 * * * Defendant and plaintiff agreed that distribution of any proceeds

representing counsel fees would be made on an equitable basis, based upon the work necessary for the successful conclusion of the matter by settlement or trial." Although this answer clearly posited an agreement for equitable division of fees after July 1, De Marco declared that the answer was incorrect because the firm's files had been divided in September, 1975, and that thereafter each party could pay to the other a share of the fee he had collected if, in his own discretion, he believed his ex-partner deserved it. Nishman's lawyer then attempted to sift out this account of the agreement:

"Q * * * First of all, did you have any agreement with Mr. Nishman? * * *

"A There was no agreement as such, there was an understanding that I would give him an equitable share as he gave an equitable share to me out of the files he kept for the work that I completed.

"Q Now, was the agreement that you would give him—that you would each take an equitable share, or was the agreement that each of you could give the other something if you felt like it?

"A That was it.

"Q That was it? It wasn't really an agreement then for an equitable share, it was an agreement that if you felt like giving him something, you would give him something?

"A Exactly. And I did not expect anything from this case, and the effort you put in shows that.

"Q I don't want to put words in your mouth, Mr. De Marco, but what you are telling me—and tell me if this is right—it wasn't really in any agreement at all—I mean, you just parted and if you felt like giving him something, you would give him something, and if he felt like giving you something, that he would give you something?

"A That was the agreement.

"Q That wasn't really an agreement at all, was it, Mr. De Marco?

"A You're absolutely right."

To reconcile the inconsistency between an agreement for an equitable division and no agreement at all, defendant explained that his answer to interrogatory 1 in which he postulated the existence of an agreement applied only to the period from July 1, 1974 to September, 1975. Later, De Marco as-

serted—consistent with counsel's stipulation at the close of plaintiff's case—that if a matter had been concluded between those two dates, the fee division was 50-50. De Marco also asserted that his answer to interrogatory number 1 was the result of his understanding of the meaning of the term "partnership matters" as set forth in the interrogatories and that no such matters existed after June 30, 1974 when the partnership ended. Nevertheless, no such problem of comprehension concerning "partnership matters"—which had been clearly defined in the interrogatories as cases in which Nishman & De Marco was representing any party as of July 1, 1974—was manifested in the answers to interrogatories 2 and 3 concerning cases which had been allotted to him as a result of the September division of the files.

On this record, we conclude that we cannot gainsay Special Term's determination of the credibility issues and its conclusion that the parties had agreed upon an equal division of fees received after September 30, 1975. What then remains for consideration is whether clean hands analysis mandates a reversal of the interlocutory judgment.

## II

Throughout the presentation of De Marco's case, Nishman objected to the testimony of certain witnesses on the ground that their statements concerning his alleged efforts to filch cases and clients from the defendant was collateral to the single stipulated issue as to the parties' agreement. In reply to these objections, De Marco's counsel stated that the evidence offered related to Nishman's credibility. Never prior to the close of the evidence was mention made of the clean hands doctrine. Although Special Term ruled that the introduction of collateral evidence to impeach Nishman's credibility by the showing of immoral acts would not be permitted, it did allow some evidence relating to the subject to remain in the record on the theory that it reflected on whether Nishman's conduct was consistent with an agreement for equal distribution of fees. Thus, there was testimony which convinced Special Term that in one instance Nishman had unsuccessfully attempted to steer a client away from De Marco. Special Term also found that Nishman's attempt to interject himself as trial counsel in another case was "especially odd" because plaintiff was not a trial lawyer and no explanation was forthcoming. The record reveals several other instances of efforts to steer clients.

When defendant rested his case, his attorney moved to dismiss the complaint arguing that Nishman had failed to establish a 50-50 agreement and, for the first time, sought dismissal on the ground that Nishman was seeking equity although his hands were unclean.

In rejecting the clean hands contention, Special Term said: "In his memorandum of law defendant expends considerable effort in urging that the Court should deny relief to the plaintiff because the plaintiff does not come into court with clean hands. As indicated in the paragraphs immediately preceding each of the parties is subject to some criticism for having performed at times with less than complete fairness or candor. The opportunity for disposing of the case by declaring that the Court would deny relief and leave the parties where it found them was momentarily tempting. However, the Court feels that in fairness such a short shrift disposition should not be made. The parties had agreed that the trial would be concerned only with the issue of what the parties' partnership agreement was. The Court accepted the submission on that basis."

Although we agree with our dissenting colleague that a fair consideration of the clean hands issue would require a remand for a full hearing, we do not agree that the merits of the issue are reachable. The parties agreed that the trial would be concerned "with the issues of what the parties' agreement was", with the additional proviso that if liability for an accounting was established, they would avoid the accounting phase of the trial by stipulating to the sum due. In De Marco's current view, Special Term gave the stipulation an overexpansive reading and interpretation. We cannot concur.

A stipulation is a contract between parties, and as such is governed by general principles for its interpretation and effect (*Yonkers Fur Dressing Co. v Royal Ins. Co.,* 247 NY 435; *Bond v Bond,* 260 App Div 781, rearg den 261 App Div 835; *Keogh v Main,* 20 Jones & Sp 160). The only conclusion to be drawn from the language used by the parties in their stipulation and from the circumstances surrounding its making is that the litigants intended to limit the issue at trial to the existence of an agreement relating to fees received after dissolution and that upon the establishment of such an agreement the sum due would be the subject of a further stipulation. Thus, any other issue—including that of clean hands—was necessarily excluded.

In an accounting action, the accounting itself may not take place until the plaintiff has established the right to it in the liability phase of the trial (see, e.g., *Kaminsky v Kahn,* 23 AD2d 231; *Wood v Cross Props.,* 5 AD2d 853; *Pomerantz v Naomi Realty Corp.,* 228 App Div 837; *Moffat v Phoenix Brewery Corp.,* 247 App Div 552; *Bourak Contr. Co. v Dayton,* 242 App Div 649; *Vejarano v Bruning,* 165 App Div 246; *Del Genovese v Del Genovese,* 149 App Div 266; *Solar Baking Powder Co. v Royal Baking Powder Co.,* 128 App Div 550). If the only purpose of the instant stipulation—as De Marco urges in his brief—was to provide for the very bifurcated trial that the law required, then the stipulation lacked any significance at all and counsel for the parties had agreed to nothing. Furthermore, it is "[n]ot only the express language of a stipulation or concession but the construction which the parties place upon it and their attitude at the trial must be given effect in determining the force of a stipulation or concession" *(Queck-Berner v Macy,* 240 NY 341, 347).

Here it is obvious that both Special Term and the plaintiff viewed the stipulation as limiting the evidence to that which reflected upon the existence and contents of an agreement. Nishman repeatedly objected to certain evidence as being collateral to the trial issues, and Special Term repeatedly sustained the objections if no connection to those issues could be shown. When scrutinized, De Marco's conduct at the trial indicates that he, too, understood the stipulation as excluding the clean hands issue. In response to Nishman's objections as to relevance of proof, De Marco's counsel argued that the disputed matter either related to plaintiff's credibility as a witness, or that it tended to disprove the existence of an equal fee agreement. Since it is not argued that De Marco and his lawyer were unaware of the clean hands doctrine, their careful avoidance of its mention until the end of the trial and their own interpretation of the evidence bearing on Nishman's ethics during the trial make it obvious that they, too, regarded the stipulation as exclusionary.

### III

Finally, there is the question raised in the dissent as to the capacity of the parties to stipulate away the issue of clean hands. In this respect, we begin our analysis by noting that the law concerning the effect to be given to stipulations freely agreed to between parties to litigation is both long standing

and lucid. The rule in civil controversies is that: "Parties by their stipulations may in many ways make the law for any legal proceeding to which they are parties, which not only binds them, but which the courts are bound to enforce * * * [A]ll such stipulations not unreasonable, not against good morals, or sound public policy, have been and will be enforced" (*Matter of New York, Lackawanna & Western R. R. Co.,* 98 NY 447, 453).

The cleanliness of hands is not implicitly pleaded in every equity complaint so as to require the plaintiff to prove his freedom from guilt as a substantive element of his claim. Rather, evidence of sufficient quality must be introduced to overcome the presumption that the hands of the plaintiff are clean (*Purity Cheese Co. v Ryser Co.,* 153 F2d 88; *Larson Co. v Lamont, Corliss & Co.,* 257 F 270). Since in the absence of such evidence the court could not have refused enforcement of Nishman's claim once it was established, the question is whether the defendant could agree to limit the evidence he introduced to a specific issue and thereby waive his right to seek defeat of the plaintiff on clean hands considerations.

The judicial policy in favor of the enforcement of stipulations (see *Matter of Abramovich v Board of Educ.,* 46 NY2d 450, cert den 444 US 845; *Morse v Morse Dry Dock & Repair Co.,* 249 App Div 764) has found widespread application. Thus, parties may stipulate away procedural defects in litigation (see, e.g., *Matter of Albano v Kirby,* 36 NY2d 526; *Dubuc v Lazell, Dalley & Co.,* 182 NY 482); "chart their own procedural course" in a case (*Stevenson v News Syndicate Co.,* 302 NY 81, 87; see, also, *Cullen v Naples,* 31 NY2d 818); waive jurisdictional defects not involving the subject matter to maintenance of the suit (see, e.g., *Matter of Powley v Dorland Bldg. Co.,* 281 NY 423; *Cowenhoven v Ball,* 118 NY 231; *Vose v Cockcroft,* 44 NY 415); or stipulate to the judgment which the court is to enter upon resolution of disputed facts (see *Mann v Simpson & Co.,* 286 NY 450). Similarly, parties may by stipulation shape the facts to be determined at trial and thus circumscribe the relevant issues for the court to the exclusion of other disputed matters which would be available to the parties in the absence of a limiting stipulation (see, e.g., *Matter of Albano v Kirby, supra; Queck-Berner v Macy,* 240 NY 341, *supra; Hine v New York El. R. R. Co.,* 149 NY 154; *Salesian Soc. v Village of Ellenville,* 58 AD2d 711; *Sargent v Halsey,* 42 AD2d 375; *Heath v State of New York,* 278 App

Div 8, affd 303 NY 658). While the cited cases support the rule that parties are free to mold the contours of their lawsuit within broad parameters, consideration must be given to whether stipulation is available to waive issues relative to clean hands insofar as the doctrine rests on public policy considerations (see *Richards v Levy,* 40 AD2d 1055; *Levy v Braverman,* 24 AD2d 430; 2 Pomeroy, Equity Jurisprudence [5th ed], § 397).

The public policy aspects of clean hands have their derivation in the Crown's original delegation of its prerogative power of grace to the Chancellor who was required to exercise the power to enforce the dictates of conscience, fairness and good faith. If the suitor in equity required enforcement of a tainted claim, he was refused the aid of equity and relegated to his action at law (see, generally, 1 Pomeroy, *op. cit.,* § 50). Thus, even in those days, the public policy considerations were not forceful enough to deprive the offensive plaintiff of his legal remedy. Although the differences in form between actions at law and suits in equity have been long abolished in this State (see CPLR 103; Field Code [1848], §§ 2, 3, 4, 69), the rules governing the distinct bodies of common law and equity jurisprudence have survived intact (see *Cox v City of New York,* 265 NY 411, cert den 294 US 729; *Carroll v Bullock,* 207 NY 567; *Lane v Mercury Record Corp.,* 21 AD2d 602, affd 18 NY2d 889; *Park & Sons Co. v Hubbard,* 134 App Div 468, affd 198 NY 136). But the fact that the clean hands doctrine has survived the merger of law and equity does not endow it with a special sanctity which precludes its waiver by the litigants.

The significance of the policy of supporting judicial encouragement of stipulations between litigants has been demonstrated by recent holdings that even those aspects of public policy embodied in statute are not impervious to waiver. In *Matter of Abramovich v Board of Educ.* (46 NY2d 450, *supra),* the policy question concerned the ability to waive the procedural safeguards afforded to tenured teachers by section 3020-a of the Education Law, an area previously regarded as almost sacrosanct because of its importance in the maintenance of the State's educational system (see, e.g., *Matter of Boyd v Collins,* 11 NY2d 228; *People ex rel. Callahan v Board of Educ.,* 174 NY 169; *Matter of Amos v Board of Educ.,* 54 AD2d 297, affd 43 NY2d 706; *Matter of Monan v Board of Educ.,* 280 App Div 14). In rejecting the argument that the agreement between the parties waiving a tenure hearing was void as a

circumvention of the "critical" rights the statute intended to secure, the court noted (p 455) that when the waiver was "freely, knowingly and openly arrived at, without taint of coercion or duress" public policy had not been offended. To arrive at this conclusion, the Court of Appeals directly over-ruled *Matter of Boyd v Collins (supra)*, which had been read to preclude enforcement of the waiver precisely because of the strong public policy underlying teacher tenure statutes.

Even more recently, in *Matter of Feinerman v Board of Coop. Educational Servs. of Nassau County* (48 NY2d 491), involving the expectation of tenure and the right to be ap-pointed to a three-year probationary term, the Court of Ap-peals broadened the availability of a knowing and freely made waiver to yield statutorily guaranteed rights, finding that public policy considerations would not forbid relinquishment. Support for the *Feinerman* conclusion was drawn from *Abra-movich* where the waived rights were acknowledged to have been founded in "strong public policy considerations" (48 NY2d, at p 497).

Indeed, "[j]udicial acceptance of compromises in which the most fundamental of rights are waived is not uncommon" *(Matter of Abramovich v Board of Educ., supra,* p 456). Judi-cial policy has been so solicitous of stipulations that it is undeniable that constitutionally secured rights (see, e.g., *Broo-kins v United States,* 397 F2d 261, cert den *sub nom. Houston v United States,* 393 US 952; *Butler v Wilson,* 365 F2d 308; *United States v Booker,* 363 F2d 856; *De La Maza v United States,* 215 F2d 138; see, also, *Matter of Wolf v Assessors of Town of Hanover,* 308 NY 416; *Matter of Malloy,* 278 NY 429; *Matter of Cooper,* 93 NY 507; cf. *Schneckloth v Bustamonte,* 412 US 218 [waiver]; *Fuentes v Shevin,* 407 US 67, reh den 409 US 902 [waiver]; *Overmyer Co. v Frick Co.,* 405 US 174 [waiver]) as well as those evinced by positive act of the Legislature (see, e.g., *Matter of Feinerman v Board of Coop. Educational Servs. of Nassau County, supra; Matter of Abra-movich v Board of Educ., supra; Kassner & Co. v City of New York,* 46 NY2d 544) may validly be waived without offending public policy. It scarcely requires reiteration that an individ-ual may waive even his right to compel the State to establish his criminal guilt beyond a reasonable doubt by bargaining for a plea under the aegis of the criminal justice system (see, e.g., *People v Francis,* 38 NY2d 150; *People v Selikoff,* 35 NY2d 227, cert den 419 US 1122).

The comparatively few instances in which public policy does prohibit the enforcement of a stipulation—such as would circumvent the policy embodied in certain of the State's domestic relations statutes (see *Weiman v Weiman,* 295 NY 150; *Gullo v Gullo,* 46 AD2d 991; cf. *Greschler v Greschler,* 71 AD2d 322) or where the effect would be to declare a statute unconstitutional *(Fougera & Co. v City of New York,* 224 NY 269) or to uphold an illegal agreement (see *Palmer v Board of Educ.,* 276 NY 222; *Baksi v Wallman,* 271 App Div 422, affd 297 NY 456) or where the strength of the public policy is evidenced by statutory provisions precluding waiver (see *Estro Chem. Co. v Falk,* 303 NY 83)—clearly indicate that nonwaivable matters are those fundamental to the fabric of society (see *Cancemi v People,* 18 NY 128, 137) or good governance (see *Driskell v Alfano,* 12 AD2d 973; *Fracchia v State of New York,* 54 Misc 2d 25).

Nor does the "good morals" aspect of the law of stipulations preclude enforcement of the instant stipulation. The most fundamental element of good morals—the enforcement of the criminal laws—is now the subject of a bargaining process by which the State's obligations to seek convictions for specifically charged criminal acts are waived to accommodate problems of calendar congestion or other considerations advantageous to the law enforcement system (see, e.g., *People v Francis, supra; People v Esajerre,* 35 NY2d 463; *People v Selikoff, supra;* see, also, *United States ex rel. Jackson v Fay,* 232 F Supp 897). Indeed, while the public policy and good morals force underlying the clean hands doctrine may suffice to invoke the Chancellor's discretion to reject an equity claim he regards as tainted, it is not strong enough to spill over to and vitiate a legal claim or remedy based on the same set of facts. We conclude that the defendant could agree to refrain from raising ethical taint to defeat plaintiff's equity claim and the Trial Justice who accepted such a submission could enforce it.

Accordingly, the interlocutory judgment should be affirmed.

O'CONNOR, J. (dissenting). As of July 1, 1974, the law firm of Nishman & De Marco, which had survived for some 12 rather turbulent years, was terminated by mutual consent of both defendant-appellant and plaintiff-respondent. As of that date, the partnership ceased and no new business was accepted but, because of an outstanding lease on the firm's

offices, the parties did not physically part nor go their separate ways until September of 1975.

At that time the offices were vacated, the physical assets, including all furniture and furnishings, were sold or otherwise disposed of and the remaining open partnership files were divided, each partner taking those files which had come to the firm through his efforts.

It should be here noted that although there was from the beginning no written partnership agreement, the parties had expressly agreed that the firm's earnings would be shared equally on a 50-50 basis.

It is the sharply divergent claims advanced by the erstwhile partners as to the division of fees collected subsequent to September, 1975 that give rise to this rather bitterly contested accounting action.

On the one hand, it is respondent's contention, sustained at Special Term, that the parties agreed that "we would continue on the same basis that we had for the past twelve years, and that would be to divide equally after expenses." In other words, it is respondent's position that the 50-50 division of income, as maintained throughout the life of the partnership, would continue. He therefore demands a formal accounting and a division of the collected fees in accordance with that agreement.

On the other hand, it is appellant's contention that the physical separation in September, the disposal of the physical assets and the division of the files of the partnership at that time constituted an informal accounting. Hence, there is nothing left to divide or to account for and the complaint should therefore be dismissed. Despite some obvious confusion and conflicts in his testimony, appellant claims, in substance, that "he took his files and I took my files" and that it was agreed that each would keep the fees generated by the files in his individual possession subject only to some completely voluntary and discretionary payments that are not relevant to this disposition.

At the commencement of this nonjury trial for an accounting, the parties placed on the record a stipulation that the court was to determine only "what the parties' agreement was." Despite this limiting stipulation, substantial evidence was adduced during the trial concerning unethical and immoral acts of client stealing, improper file retention and theft of partnership fees. Most of this conduct was charged to

respondent and it is noted that appellant continually offered this evidence as bearing on respondent's credibility upon the accepted theory that proof of immoral acts is relevant for impeachment purposes.

Appellant introduced testimony that respondent wrongfully sought to take clients from him on at least three occasions. The first incident occurred during the interim period of separation between July, 1974 and September, 1975, when a Mrs. Lopez came to their still shared offices and asked to see appellant about a serious accident involving her husband. Ida Agnese affirmed that she had referred Mrs. Lopez to appellant. Ursula Mollison, a secretary, testified that Mrs. Lopez asked for Mr. De Marco and that when Ms. Mollison suggested that the appointment was with Mr. Nishman, Mrs. Lopez stated that this was not so and that her appointment was with Mr. De Marco. She testified further that when respondent was told of the situation, he took Mrs. Lopez into his office, closed the door and had Mrs. Lopez sign a retainer naming him rather than appellant as her attorney. Respondent testified that Mrs. Lopez' daughter had asked him to represent them, that when Mrs. Lopez asked for appellant, he (respondent) informed her that they were no longer associated and that she thereupon chose to retain respondent because she really knew neither attorney. It was respondent's testimony that Mrs. Lopez retained him with full knowledge that he was no longer associated with appellant and that subsequently Mrs. Lopez insisted on staying with respondent. It is significant that the trier of facts concluded as to this matter: "I am persuaded that plaintiff attempted to steer a client who desired to engage defendant away from defendant and to himself."

The second incident involved another matter which arose prior to the physical separation of the parties but after the partnership had ended. Ellen Forte, a secretary, testified that she had referred a party by the name of Jardeli to appellant and that she told respondent that the injured party wanted De Marco to handle the case. Respondent, however, went to visit the injured party in the hospital that night and obtained a signed retainer for himself. When subsequently confronted by these facts, respondent returned the signed retainer to Miss Forte. For reasons unexplained on the record, no reference was made to this matter in Special Term's memorandum decision.

The trial testimony indicates a third incident involving the

disappearance of the Gilliard file—apparently a De Marco matter. In order to prepare for trial, appellant had to reconstruct the entire file and when the time of trial came, long after the partners separated, respondent showed up at the courtroom and, without authority, sought to interject himself as plaintiff's trial counsel despite the plaintiff's statement that he did not know and had never seen respondent before. These facts become all the more significant when the record discloses that all the trial work of the partnership was done by appellant, De Marco, and that respondent, Nishman, was the office partner. In regard to this matter, Justice YOUNG characterized respondent's conduct as "peculiar" and stated that it cast doubt on his credibility "since he is not a trial lawyer."

Further allegations of disappearing files and of wrongful fee retentions were made against respondent but the trial court repeatedly sustained objections upon the ground that such testimony was hearsay or violative of the collateral evidence rule. Hence, any in-depth probe of these other most serious charges of misconduct was completely thwarted.

Nor did appellant escape serious charges of misconduct. When asked whether he had arranged to have a partnership fee deposited in his personal account at a time when the partnership still existed, appellant responded: "I doubt that it happened. I don't believe it happened." Justice YOUNG was disturbed by appellant's "equivocation" and characterized his testimony as "evasive".

The "clean hands" doctrine, long a recognized, significant principle in equity jurisprudence, has been characterized as follows:

"A court of equity in its endeavors to maintain, promote, and enforce the interests of justice, stringently demands good faith, fairness, and uprightness from the litigant parties who come before it either as plaintiffs or defendants. * * *

"The maxim is based on the principle that to grant a wrongdoing plaintiff relief contravenes public morals * * * The courts, moreover, apply the maximum [sic] in the interest of the public and not to favor a defendant * * * [This is done] as a matter of public policy involving the standing and integrity of the court" (20 NY Jur, Equity, §§ 102-103; see, also, *Pattison v Pattison*, 301 NY 65).

Indeed, Justice YOUNG considered dismissing the action by applying the clean hands doctrine, but concluded that it was not the proper course to pursue. He reasoned: "In his memo-

randum of law defendant expends considerable effort in urging that the Court should deny relief to the plaintiff because the plaintiff does not come into court with clean hands. As indicated in the paragraphs immediately preceding each of the parties is subject to some criticism for having performed at times with less than complete fairness or candor. The opportunity for disposing of the case by declaring that the Court would deny relief and leave the parties where it found them was momentarily tempting. However, the Court feels that in fairness such a short shrift disposition should not be made. The parties had agreed that the trial would be concerned only with the issue of what the parties' partnership agreement was. The Court accepted the submission on that basis." The trial court then went to the merits of the matter and concluded that appellant and respondent had agreed to an equal division of all remaining partnership case fees, including those which generated fees after the physical separation in September, 1975.

In light of the serious misconduct established at trial, it was, in my opinion, an abuse of discretion to entertain this action. Justice YOUNG specifically found respondent guilty of improper client steering, and he questioned the propriety of his actions in another case. Many other charges of disturbing proportions were leveled. Under these circumstances a court of equity should not have addressed the merits of the action until specific findings of fact were made which established one way or the other whether the court should aid one guilty of contravening public morality.

To some degree Justice YOUNG's determination is ambiguous. He may have believed that the stipulation of the parties prevented him from dismissing the action on the clean hands doctrine. If this be so, he erred as a matter of law. Indeed, the doctrine need not be pleaded at all and in an appropriate case may be raised by the court *sua sponte.* It is brought into play in the interests of the public, as a matter of public policy, and is not invoked to favor a defendant. The parties could thus not remove this matter from the court's jurisdiction (see *Richards v Levy,* 40 AD2d 1055; see, also, *Levy v Braverman,* 24 AD2d 430).

It is conceivable that Justice YOUNG weighed the relative immorality of the opposing sides and determined that he would entertain the action as a matter of discretion to prevent an injustice. The clean hands doctrine should never be in-

voked where it works an injustice and Justice YOUNG, perhaps believing that defendant was also guilty of misconduct and that were respondent denied access to an accounting appellant would unfairly retain fees properly belonging to respondent, decided that the discretionary doctrine of clean hands should remain dormant. If this be so, a serious abuse of discretion occurred. "It is an established rule that no relief will be given to a guilty plaintiff in equity even though the defendant is equally guilty. Equity does not make adjustments between wrongdoers" (20 NY Jur, Equity, § 114). Thus, appellant's equivocal denial of the charge against him could not serve to negate the misconduct of respondent. Furthermore, I note that the substantive question of what the agreement of the parties was is not at all free from doubt. Despite my hesitancy to reverse the trier of facts on this question, and without entering into an extended discussion of the merits of the dispute, I simply suggest that a refusal to entertain the action would not in any way result in an injustice under the facts here involved.

As the record now stands, it contains a finding of serious misconduct on Nishman's part and leaves several other charges of misconduct unresolved. Thus, it is pregnant with implications that may well adversely affect his future career. Simple justice demands that these charges be fully explored and finally disposed of. Although the doctrine of clean hands may be raised by the court *sua sponte* (see *Richards v Levy, supra,* p 1056), here it was not pleaded as a defense and respondent may well have been totally unprepared to meet the charges leveled at him during the trial. Appellant continually insisted that much of the evidence of misconduct introduced went only to the question of credibility, thus lending substance to respondent's assertion that much which could have been offered to refute the damaging evidence against him would have been inadmissible as being collateral (see Richardson, Evidence [10th ed—Prince], § 491). Under these circumstances, and in light of the profound consequences which will flow from the findings that public policy and simple fairness dictate must be made, the appeal should be held in abeyance and this matter should be remanded for a full hearing with specific findings of fact as to what misconduct, if any, transpired. Until such time as these essential factual determinations are made, the substantive merits of the dispute should not be addressed. To do so perpetrates an injustice not only on the public but on the parties themselves.

RABIN and MARGETT, JJ., concur with LAZER, J. P.; O'CON-NOR, J., dissents and votes to hold the appeal in abeyance and remit the case for a hearing, with an opinion.

Interlocutory judgment of the Supreme Court, Nassau County, entered March 26, 1979, affirmed, with costs.