Freddie **HAMILTON**, et al., Plaintiffs,

v.

**ACCU–TEK**, et al., Defendants.

No. CV–95–0049 (JBW).

United States District Court,
E.D. New York.

Jan. 22, 1999.

Elisa Barnes, New York, NY, Weitz & Luxenberg, New York, NY, By Denise M. Dunleavy, Schulte Roth & Zabel, LLP, New York, NY by Mark E. Elovitz, Michael S. Feldberg, for Plaintiffs.

Wildman, Harrold, Allen & Dixon, Chicago, IL, By James P. Dorr, Anne Giddings Kimball, for Defendants Sturm, Ruger, Colt's Manufacturing, Smith & Wesson.

Winget & Spadafora, New York, NY by Mark G. Vaughn, for Defendant Ashland Shooting Supply.

Pino & Associates, White Plains, NY by Lawrence G. Keane, for Defendants Beretta USA Corp., Beretta Firearms.

Cozen & O'Connor, Atlanta, GA, by Timothy A. Bumann, for Defendants Taurus, Bryco, Jennings, American Derringer, Lorcin, Sundance and others.

Bartlett, McDonough, Bastone & Monaghan, LLP, Mineola, NY by E. Gordon Haesloop, for Defendant Ellett Bros.

Budd Larner Gross Rosenbaum Greenberg & Sade, Short Hills, NJ, by David R. Gross, James F. Fitzsimmons, for Defendants AcuSport Corp., Bangers, L.P., Brazas Sporting Arms, Inc., Chattanooga Shooting Supplies, Inc., Davidson's Supply Co., Inc., Hill Country Wholesale, Inc., Keisler Police Supply & Ammunition Co., Inc., Lipsey's Inc., Lew Horton Distributing, Inc., RSR Wholesale South, Scott Wholesale Co., Inc., SG Distributing, Inc., SOG International, Inc., and Sports South, Inc.

Renzulli, Gainey & Rutherford, New York, NY, by John F. Renzulli, Fred E.

Scharf, for Defendants Glock, Inc., Accu-tek, Thompson Center, Navegar, Intratec, Para Ordnance, Olympia.

Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, New York, NY by Daniel T. Hughes, Erin A. O'Leary, for Defendant American Arms.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY by Robert L. Joyce, for Defendant Sigarms, Inc.

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

I. INTRODUCTION ............................................................333

II. FACTS AND PROCEDURAL BACKGROUND .............................334
 A. Procedural History ...............................................334
 B. Out-of-State Shootings ...........................................334
 1. Christopher Malachi ..........................................334
 2. David Johnstone ..............................................335

III LAW .....................................................................335
 A. Choice of Law ....................................................335
 1. New York's Choice of Law Rules ..............................335
 2. Renvoi ......................................................338
 B. Transfer .........................................................339

IV APPLICATION ...........................................................339
 A. Choice of Law ....................................................339
 1. Johnstone v. Accu-tek, et al.................................339
 a. Significant Contacts ...................................340
 b. Interest Analysis ......................................340
 c. Effect of Parties' Stipulation .........................343
 2. Costa v. Accu-tek, et al.....................................345
 B. Transfer .........................................................346
 1. Convenience of Parties and Witnesses ........................346
 2. Plaintiffs' Choice of Forum .................................346
 3. Practical Considerations ....................................347
 4. Interest in Local Adjudication ..............................347
 5. Familiarity with Applicable Law .............................347
 6. Interests of Justice ........................................348

V. CONCLUSION .............................................................348

## I. INTRODUCTION

In this case of first impression, relatives of persons killed by handguns, and one crippled survivor, have sued many handgun manufacturers jointly. Defendants' negligent marketing practices, plaintiffs contend, have created a large pool of illegal handguns readily accessible to violent New York criminals. Two of the nine shootings at issue here took place outside the state of New York—one in Virginia and one in California—raising potential conflicts of law.

A conflict between clearly-articulated, well-established legal rules of different jurisdictions is not presented. Each of the issues posed is novel: Did the defendants owe a legal duty to reduce the risk of criminal misuse of their product by exercising reasonable care in marketing and distributing it? Is a given defendant's liability limited to those shootings which involved a handgun made or distributed by it? May defendants be held collectively liable for the harm resulting from *all* of the shootings on the theory that their contribution to an underground market in fungible illegal handguns was the proximate cause of plaintiffs' injuries? If defendants are collectively liable, shall their liability be calculated based on each defendant's share of the relevant market? Given the

novelty of plaintiffs' claims, the laws of New York, Virginia, and California are virtually certain to conflict.

Substantial weight must be accorded the location of the tort under New York's choice of law rules and each state's fundamental interest in the physical safety of citizens and travelers within its geographical boundaries. Application of Virginia and California law to the Virginia and California shootings is mandated.

Transfer of these two cases to the states where the shootings occurred is desirable. The applicable state law is highly unsettled. Interpreting it will require a subtle appreciation of state tort law developments and nuances unique to Virginia and California. This task is best carried out by district courts sitting in those states. In addition, local juries are probably the best arbiters of the unreasonableness of the risk posed by acts with local consequences. The interests of justice will best be served by transfer of *Costa v. Accu-tek et al.* and *Johnstone v. Accu-tek et al.* to Virginia and California respectively.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. Procedural History

Katina Johnstone was one of two plaintiffs who initiated this suit in January 1995. In April 1996, her suit was consolidated with a number of other similar ones, including one filed by Veronica Costa. The complex and novel issues presented have necessitated development of a detailed and lengthy factual record. Defendants' earlier motions for summary judgment on plaintiffs' negligence claims were denied with leave to renew, on the ground that discovery was not yet complete and the issues not fully briefed. *See Hamilton v. Accu-tek,* 935 F.Supp. 1307, 1315, 1330 (E.D.N.Y.1996).

With discovery nearing completion, defendants again moved for summary judgement in November 1998, on the ground

that no cause of action existed. Oral argument was heard on December 17, 1998. The motion was denied. *See* Order dated December 18, 1998.

A series of motions to dismiss based upon lack of personal jurisdiction were denied, relying on the theory explicated in *In re DES Cases,* 789 F.Supp. 552 (E.D.N.Y.1992). *See Hamilton v. Accu-Tek,* 32 F.Supp.2d 47 (E.D.N.Y.1998) (affirming the Report and Recommendation of the Magistrate Judge on jurisdiction).

Having determined that Virginia law applied to the claims arising out of the Virginia shooting of Ms. Costa's son, and in serious doubt about the applicability of New York law to Ms. Johnstone's California-based claims, the court severed *Costa v. Accu-tek et al.* and *Johnstone v. Accu-tek et al.* from the cases set for immediate trial. *See* Order dated December 22, 1998. Decision on the issue of transfer was reserved pending final resolution of the choice of law issue. *See* Order dated December 29, 1998.

### B. Out–of–State Shootings

#### 1. Christopher Malachi

Christopher Malachi was shot and killed in Portsmouth, Virginia on April 19, 1994. He was twenty-three years old. Malachi was a New York domiciliary planning to return to New York to live. *See Hamilton v. Accu-Tek,* 13 F.Supp.2d 366 (E.D.N.Y. 1998). At the time of his murder, he had resided in Virginia as both college student and house painter for four years.

The Portsmouth police questioned a number of witnesses with possible connections to the gun used in the Malachi shooting, but the gun itself was never recovered. Expended bullets and casings were collected from the crime scene and were analyzed by the Virginia Department of General Services Division of Forensic Science.

### 2. David Johnstone

David Johnstone was a New York resident and domiciliary. He was shot while visiting San Francisco on July 29, 1992, and died one month later in New York. The shooter, a 16–year old resident of California, ultimately pled guilty to murder. The San Francisco Police Department recovered the gun used to shoot Mr. Johnstone, a Smith & Wesson .38 caliber revolver. It had been registered in California in 1988 and had been stolen from the Marin County home of its lawful owner two weeks before the shooting.

## III LAW

### A. Choice of Law

 A choice of law question is presented when a dispute implicates the interests of two or more states and application of each state's law would be consistent with the Full Faith and Credit and Due Process Clauses of the Constitution. *See Cooney v. Osgood Machinery,* 81 N.Y.2d 66, 70–71, 612 N.E.2d 277, 279, 595 N.Y.S.2d 919, 921 (1993); *Diehl v. Ogorewac,* 836 F.Supp. 88, 91 (E.D.N.Y.1993). These modest constitutional requirements are met if each state whose law is sought to be applied has "significant contacts or significant aggregation of contacts creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 313, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). *See also Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818–23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

 *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires a federal court sitting in diversity to apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998).

### 1. New York's Choice of Law Rules

More than a third of a century ago, a revolution in choice of law standards was largely started by the seminal case of *Babcock v. Jackson,* 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963) (Fuld, J.). *See, e.g.,* Symeon C. Symeonides et al., *Conflict of Laws: American, Comparative, International* 286–88 (1998) (methodological camps still existing in 1997, analyzed state-by-state); Maurice Rosenberg et al., *Conflict of Laws* (Teacher's Manual) 86 (10th ed. 1996) ("*Babcock* is widely regarded as the landmark case that began the change in approaches to choice of law by United States courts."); Harold L. Korn, *The Choice of Law Revolution: A Critique,* 83 Colum. L.Rev. 772, 827 (1983). The New York Court of Appeals adopted an "interest analysis" for torts conflicts, departing from the American standard application of *lex loci delicti,* or the law of the place of the wrong. *Babcock* involved two New York domiciliaries and stemmed from a car crash in Ontario, Canada. New York law afforded the plaintiff passenger a remedy, but Ontario had a "guest statute" precluding her recovery from the defendant driver. The court held that "[j]ustice, fairness and, the best practical result, may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation." *Babcock,* 12 N.Y.2d at 481, 191 N.E.2d at 283, 240 N.Y.S.2d at 749 (internal quotation marks and citation omitted). It applied New York law, reasoning that New York's interest in a case involving New York parties, a New York automobile, and trip starting from and due to end in New York was certainly greater than Ontario's completely accidental and "at best minimal" interest in the matter. *Id.* at 482, 191 N.E.2d at 284, 240 N.Y.S.2d at 750.

336

In a series of subsequent cases the Court of Appeals refined the *Babcock* court's "grouping of contacts" approach, fashioning an analysis which gives the greatest weight to those contacts which are relevant to the policies animating the particular rules in conflict. *See Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 196–97, 480 N.E.2d 679, 683–84, 491 N.Y.S.2d 90, 94–95 (1985). "'Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'" *AroChem Int'l v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992) (*quoting Schultz,* 65 N.Y.2d at 197, 480 N.E.2d at 684, 491 N.Y.S.2d at 95).

In connection with this development, New York courts have recognized a conceptual distinction between conduct-regulating and loss-allocating laws. *See, e.g., Padula v. Lilarn Properties Corp.,* 84 N.Y.2d 519, 521, 644 N.E.2d 1001, 1002–03, 620 N.Y.S.2d 310, 311–12 (1994) (choice of law analysis differs depending on whether the purpose of the laws at issue is to regulate conduct or allocate loss); *Cooney v. Osgood Machinery, Inc.,* 81 N.Y.2d 66, 72, 612 N.E.2d 277, 280, 595 N.Y.S.2d 919, 922 (1993) ("An immediate distinction was drawn between laws that regulate primary conduct (such as standards of care) and those that allocate losses after the tort occurs (such as vicarious liability rules).") ; *AroChem,* 968 F.2d at 270 (same).

Loss-allocating rules are "those which prohibit, assign, or limit liability after a tort occurs, such as charitable immunity statutes, guest statutes, wrongful death statutes, vicarious liability statutes, and contribution rules." *Padula,* 84 N.Y.2d at 521, 644 N.E.2d at 1003, 620 N.Y.S.2d at 312 (citations omitted). Under New York's choice of law rules, the interest of the locus jurisdiction in having its loss-allocation rule applied is deemed to be minimal. *See Schultz,* 65 N.Y.2d 189, 198, 480 N.E.2d 679, 685, 491 N.Y.S.2d 90, 96. Conflicts between loss allocation rules are analyzed under the rubric first set forth in *Neumeier v. Kuehner,* 31 N.Y.2d 121, 286

N.E.2d 454, 335 N.Y.S.2d 64 (1972) (Fuld, C.J.), in the context of guest statutes and later extended to all loss-allocation rules. *See Schultz,* 65 N.Y.2d at 198, 480 N.E.2d at 686, 491 N.Y.S.2d at 97 (finding "no logical basis for distinguishing guest statutes from other loss-distributing rules"). The analytical framework is as follows:

■ 1. When the parties are domiciled in the same state, the law of that state controls.

■ 2. When the conduct occurs in the state of defendant's domicile, and he would not be liable under that state's laws, he should not be held liable under the tort law of the plaintiff's domicile. Conversely, when a plaintiff is injured in his own domicile, and the law of that state would permit him to recover, the defendant should not be allowed to interpose his own state's law.

■ 3. When the parties are domiciled in different states, "'[n]ormally the applicable rule of decision will be that of the state where the accident occurred but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants.'" *Neumeier,* 31 N.Y.2d at 128, 286 N.E.2d at 458, 335 N.Y.S.2d at 70 (quoting *Tooker v. Lopez,* 24 N.Y.2d 569, 585, 249 N.E.2d 394, 404, 301 N.Y.S.2d 519, 533 (1969) (Fuld, C.J., concurring)). *See also, e.g.,* Symeonides et al. *supra,* at 270–79 (table and analysis of *Neumeier* rules).

Conduct-regulating rules are those which "have the prophylactic effect of governing conduct to prevent injuries from occurring." *Padula,* 84 N.Y.2d at 522, 644 N.E.2d at 1002, 620 N.Y.S.2d at 311. When such rules conflict, the law of the place of the tort governs. *See, e.g. id.; Cooney,* 81 N.Y.2d at 74, 612 N.E.2d at

282, 595 N.Y.S.2d at 924 (where conduct regulating is at issue "the traditional rule of *lex loci delicti* almost invariably obtains"); *Schultz,* 65 N.Y.2d at 198, 480 N.E.2d at 684–85, 491 N.Y.S.2d at 95–96. *See also, e.g.,* Symeonides et al., *supra,* at 279–282 (issues of conduct regulation).

Loss-allocation and conduct-regulation are not rigid categories. The distinction between them serves as a proxy for the ultimate question of which state has the greater interest in having its law applied. The assumption is that in conflicts between laws aimed at the regulation of primary conduct,

> the law of the place of the tort will usually have a predominant if not exclusive concern because the locus jurisdiction's interest in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interests of the common-domicile jurisdiction.

*Schultz,* 65 N.Y.2d at 198, 480 N.E.2d at 685, 491 N.Y.S.2d at 96 (internal quotation marks and citations omitted). Thus "it would be almost unthinkable to seek the applicable rule in the law of some other place" than the place where the tort occurred where that jurisdiction's conduct-regulating laws were designed to control the conduct at issue. *Babcock,* 12 N.Y.2d at 483, 191 N.E.2d at 280, 240 N.Y.S.2d at 751.

By contrast, where the conflict is between loss-allocating rules, the locus jurisdiction has a lesser interest and the interest of the parties' domiciles assumes correspondingly greater importance. *See, e.g., Cooney,* 81 N.Y.2d at 72, 612 N.E.2d at 280, 595 N.Y.S.2d at 922 ("if competing 'postevent remedial rules' are at stake other factors are taken into consideration, chiefly the parties' domiciles" (citing *Schultz,* 65 N.Y.2d at 197–99, 480 N.E.2d at 684, 491 N.Y.S.2d at 95)); *AroChem,* 968 F.2d at 270 ("[W]hen the law in conflict is loss allocating, the state where at least one of the parties is domiciled generally applies.").

In cases where the defendant's tortious conduct and the plaintiff's injury occur in different states "the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz,* 65 N.Y.2d at 195, 480 N.E.2d at 683, 491 N.Y.S.2d at 94. *See also Pescatore v. Pan American World Airways, Inc.,* 97 F.3d 1, 13 (2d Cir.1996); *Kush v. Abbott Lab.,* 238 A.D.2d 172, 173, 655 N.Y.S.2d 520, 521 (1st Dep't 1997).

A court may refuse to apply a foreign law deemed applicable under New York's choice of law rules only where that law is "truly obnoxious" to New York public policy. *Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1031 (2d Cir.1996), *cert. denied,* 519 U.S. 1116, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997). *See also, Cooney,* 81 N.Y.2d at 78, 612 N.E.2d at 284, 595 N.Y.S.2d at 926 ("[W]hen otherwise applicable foreign law would 'violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal' the court may refuse to enforce it." (quoting *Loucks v. Standard Oil Co.,* 224 N.Y. 99, 111, 120 N.E. 198, 202 (1918) (Cardozo, J.))). Public policy exceptions are reserved for those rare cases in which choice of a foreign jurisdiction's law would be deeply abhorrent from the point of view of fundamental New York policy. *See, e.g., Mertz v. Mertz,* 271 N.Y. 466, 3 N.E.2d 597 (1936) (interspousal torts). Frequent public policy exceptions would entirely frustrate choice of law principles. As Chief Judge Kaye explained,

> [P]lainly not every difference between foreign and New York law threatens our public policy. Indeed, if New York statutes or court opinions were routinely read to express fundamental policy, choice of law principles would be meaningless. Courts invariably would be

forced to prefer New York law over conflicting foreign law on public policy grounds. *Cooney*, 81 N.Y.2d at 79, 612 N.E.2d at 284, 595 N.Y.S.2d at 926.

### 2. Renvoi

Renvoi is the French word for "send back." In the conflicts context, renvoi refers to the situation which arises when a court applying foreign law includes the foreign state's conflicts rules, and these refer the issue back to the law of the forum. Some commentators have argued that a court should, in these circumstances, avoid a perpetual cycle back and forth between two jurisdictions by accepting the renvoi and applying its own law. *See, e.g.,* Eugene F. Scoles and Peter Hay, *Conflict of Laws* § 3.13, at 69–70 (2d ed.1992) (arguing that the forum should accept the renvoi since a foreign conflict rule which refers the matter back to the forum evinces a lack of interest in having its own jurisdiction's law applied); Larry Kramer, *Return of the Renvoi,* 66 N.Y.U. L.Rev. 979, 982–83 (1991) (arguing that "[t]o the extent that a foreign system defines the scope of the foreign state's law, the court should accept the renvoi"); *see also American Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md. 560, 579, 659 A.2d 1295, 1304 (1995) (adopting a "limited" renvoi exception to "allow Maryland courts to avoid the irony of applying the law of a foreign jurisdiction when that jurisdiction's conflict of law rules would apply Maryland law").

The Restatement (Second) of Conflict of Laws recognizes two situations in which a court applying foreign law should also apply the foreign jurisdiction's conflicts rules: "[w]hen the objective of the particular choice-of-law rule is that the forum reach the same result on the very facts involved as would the courts of another state," Restatement (Second) of Conflict of Laws § 8(2) (1971), and "[w]hen the state of the forum has no substantial relationship to the particular issue or the parties and the courts of all interested states would concur in selecting the local law rule applicable to this issue." *Id.* at § 8(3). *See generally* Maurice Rosenberg et al., *Conflict of Laws* 445–46 (10th ed.1996) (discussing Restatement approach).

In tort cases, the application of foreign choice of law rules is generally to be avoided. *See* Restatement (Second) of Conflict of Laws § 145 cmt. h (1971) ("It should be reiterated that in the torts area the forum will not apply the choice-of-law rules of another state."). *But see Neal v. Butler Aviation Int'l, Inc.,* 460 F.Supp. 98, 103 (E.D.N.Y.1978) (Dooling, J.) (noting that New York might apply Texas choice-of-law provision where New York had "no governmental interest in the parties or their controversy, and the conflict of laws rule of Texas [was] statutory and ha[d] specific application to the lot of Texans accidentally killed outside Texas"); *cf. Dean v. Dean,* 241 N.Y. 240, 149 N.E. 844 (1925) (applying foreign conflicts rule in determining validity of divorce decree); *In re Schneider's Estate,* 96 N.Y.S.2d 652, 198 Misc. 1017 (Sur.Ct.1950) (renvoi as to title to real property).

The more modern use of foreign conflicts rules is as an aid in assessing the foreign state's interest in the application of its substantive law. *See, e.g.,* Restatement (Second) of Conflict of Laws § 8 cmt. k (1971) ("An indication of the existence of a state interest in a given matter, and of the intensity of that interest, can sometimes be obtained from an examination of that state's choice-of-law decisions."); Kramer, *supra,* 996–1003; *id.* at 1011 ("[I]f one sees choice of law rules as a process of interpretation, the court cannot ignore foreign choice-of-law rules in interpreting foreign law."). This approach integrates renvoi into the interest analysis as an additional factor to be considered. *See Chance v.*

*E.I. Du Pont De Nemours & Co.*, 371 F.Supp. 439, 446 (E.D.N.Y.1974).

## B. Transfer

Section 1404(a) of Title 28 is a venue statute. It allows transfer of a civil action to another district "[f]or the convenience of parties and witnesses, in the interest of justice .... " Transfer under section 1404(a) is within the sound discretion of the district court. *See Frasca v. Yaw*, 787 F.Supp. 327, 330 (E.D.N.Y.1992).

■ Factors to be considered by the court in determining the appropriateness of transfer include (1) the convenience of the parties and witnesses, *see, e.g., Hernandez v. Graebel Van Lines*, 761 F.Supp. 983, 988–89 (E.D.N.Y.1991); (2) the plaintiff's choice of forum, *see, e.g., Miller v. County of Passaic*, 699 F.Supp. 409, 411 (E.D.N.Y.1988); (3) practical considerations such as accessibility of sources of proof and attendance of witnesses, *see, e.g., Morales v. Navieras de Puerto Rico*, 713 F.Supp. 711, 712–13 (S.D.N.Y.1989); *Hernandez*, 761 F.Supp. at 989–90; (4) the interest in local adjudication, *see, e.g., In re Eastern Dist. Repetitive Stress Injury Lit.*, 850 F.Supp. 188, 195 (E.D.N.Y.1994); (5) the degree of familiarity of the trial court with the applicable substantive law, *see, e.g., id.* at 196; and (6) the interests of justice generally based on the totality of the circumstances, *see, e.g., Hernandez*, 761 F.Supp. at 987. No one factor is necessarily decisive.

■ A court may initiate transfer on its own motion. *See, e.g., Lead Indus. Ass'n v. Occupational Safety and Health Admin.*, 610 F.2d 70, 79 n. 17 (2d Cir.1979) (court may transfer to another district *sua sponte*); *Coker v. Bank of America*, 984 F.Supp. 757, 767 (S.D.N.Y.1997) (transferring case *sua sponte*); *McCulley v. Anglers Cove Condominium Ass'n.*, 977 F.Supp. 177, 180 (E.D.N.Y.1997) (same); 15 Charles Alan Wright et al., *Federal Practice and Procedure* § 3844, at 329 (2d ed.1986) (language of § 1404(a) "is broad enough that a judge can order transfer on his own initiative").

## IV APPLICATION

### A. Choice of Law

#### 1. *Johnstone v. Accu-tek, et al.*

■ Application of either California or New York law would be consistent with the Full Faith and Credit and Due Process Clauses. The suit was brought in New York by a New York plaintiff and arose out of the California shooting of her husband. In these circumstances, the choice of the law of either state would be neither arbitrary nor fundamentally unfair. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981).

■ A court is not free to bypass the choice of law analysis and apply New York law as it would be entitled to do in the absence of an actual conflict. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis."); *Diehl v. Ogorewac*, 836 F.Supp. 88, 92 (E.D.N.Y.1993). Notwithstanding the position of the courts of California and New York at the forefront of tort law innovation, their analyses of plaintiffs'. novel claims are bound to yield rules which differ in at least some important respects. *Compare, e.g., Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968) (adopting bystander liability) *and Thing v. LaChusa*, 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814 (1989) (limiting bystander liability to close relatives present at scene, aware of injury and suffering serious emotional distress) *with Bovsun v. Sanperi*, 61 N.Y.2d 219, 461 N.E.2d 843, 473 N.Y.S.2d 357 (1984) (adopting limited form of bystander liability available only to those plaintiffs who were in "zone of danger"). Even in the DES cases, in which the New York Court of Appeals generally followed California's market share theory of liability, *see Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 539 N.E.2d 1069, 541 N.Y.S.2d

941 (1989), the court altered the California rule significantly. *Compare Sindell v. Abbott Lab.*, 26 Cal.3d 588, 612, 163 Cal.Rptr. 132, 607 P.2d 924 (1980) (allowing exculpation where a defendant can demonstrate that its product did not injure plaintiff) *with Hymowitz* 73 N.Y.2d at 512, 539 N.E.2d at 1078, 541 N.Y.S.2d at 950 (allowing exculpation only where a defendant can demonstrate that it never marketed DES for pregnancy purposes). *See also In Re DES Cases*, 789 F.Supp. at 566 (choice of law analysis based on conflict between New York and California's market.share theories). Given the likelihood of actual conflict between New York and California law determination of which state has the greater interest in having its law applied to the dispute is required.

### a. Significant Contacts

As noted in Part III.A.1. *supra*, the parties' domiciles and the location of the tort are the significant contacts for purposes of evaluating the relative strength of state interests in tort cases. *See Schultz*, 65 N.Y.2d at 197, 480 N.E.2d at 684, 491 N.Y.S.2d at 95. The plaintiff is a New York domiciliary as was her husband at the time of the shooting and until his death one month later in New York. A number of the manufacturers and distributors are domiciled in California; the majority, however, are scattered throughout the country. Though the tortious conduct in question, defendants' allegedly negligent marketing and distribution practices, is diffuse, the location of the tort is deemed to be California because this is the state where the "last event necessary to make [defendants] liable," 65 N.Y.2d at 195, 480 N.E.2d at 683, 491 N.Y.S.2d at 94, the shooting, occurred. The points of distribution involved many states and vary from company to company; if the significant contact were the point of distribution, so many states' laws would be involved that consolidation of defendants would be impractical.

### b. Interest Analysis

The laws in conflict here concern both conduct regulation and loss allocation. Rules establishing the requirements for liability in tort, such as those governing the viability of plaintiffs' negligent marketing and distribution claims, are quintessentially conduct regulating since they are designed to keep illegal, potentially killing, handguns outside the jurisdiction. *See, e.g., Curley*, 153 F.3d at 13–15 (laws of negligence, gross negligence and false imprisonment are conduct regulating rules). New York's choice of law rules mandate application of the law of the place of the tort—in this case California—where the conflict is between laws of this type. *See, e.g., Padula*, 84 N.Y.2d at 522, 644 N.E.2d at 1002–03, 620 N.Y.S.2d at 311–12 (applying law of place of injury where work site safety rules were deemed "primarily conduct regulating"); *Curley*, 153 F.3d at 15 (applying locus law to out-of-state tort where conflict was between conduct-regulating rules); *AroChem Int'l Inc. v. Buirkle*, 968 F.2d 266, 270–71 (2d Cir.1992) (same).

By contrast, collective liability rules have both conduct regulating and loss allocating components. *See generally, Hamilton v. Accu-tek*, 935 F.Supp. 1307, 1327–1329 (E.D.N.Y.1996) (discussing law of collective liability); *Hymowitz*, 73 N.Y.2d at 504–508, 539 N.E.2d at 1073–75, 541 N.Y.S.2d at 945–47 (same). Although one of the functions of collective liability is to compensate victims whose injury would otherwise go unredressed, application of the rule also serves a vital deterrent function, weighing in favor of application of the law of the place of the tort. *See, e.g., In Re DES Cases*, 789 F.Supp. at 567 (collective liability rules are arguably mainly concerned with the regulation of conduct); *cf. Padula*, 84 N.Y.2d at 522, 644 N.E.2d at 1003, 620 N.Y.S.2d at 312 (recognizing loss allocating and conduct regulating aspects of law imposing strict and vicarious liability for failure to take adequate safety measures at work site but characterizing it as "primarily conduct regulating").

Even if these collective liability rules are viewed as loss allocating the choice of law

result would be the same. The second Neumeier rule requires application of California law to the extent it favors the California manufacturers and distributors. As regards the other defendants, the third Neumeier rule requires choice of California law since, for reasons to be explored more fully below, it cannot be said that displacing California law with New York law would "advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants." *Neumeier,* 31 N.Y.2d at 128, 286 N.E.2d at 458, 335 N.Y.S.2d at 70 (quoting *Tooker v. Lopez,* 24 N.Y.2d 569, 585, 249 N.E.2d 394, 404, 301 N.Y.S.2d 519, 533 (1969)). Cases falling within the ambit of this exception generally concern accidents in which plaintiffs were in transit through a state whose connection to the event is thus purely fortuitous. *See, e.g., Sheldon v. PHH Corp.,* 135 F.3d 848 (2d Cir.1998) (plaintiffs traveling through Michigan by car); *Pescatore v. Pan American World Airways,* 97 F.3d 1, 14 (2d Cir.1996) (air disaster over Lockerbie, Scotland).

The instant case involves a voluntary business trip to California and thus does not fit this pattern of those in transit. California's tie to the killing was in some sense accidental of course, since if the deceased had not been at the particular place and time congruent with the speeding bullet, he would have escaped injury. But in a larger sense, his presence was equivalent to that of any person in California expecting the protection of that state from killers employing handguns.

The fact that defendants' allegedly tortious conduct is widely geographically dispersed does not alter the analysis. The law of the state where the conduct occurred will only displace the law of the place of the injury if that state has a more significant relationship to the occurrence and the parties. *See* Restatement (Second) of Conflict of Laws §§ 146 cmt. e, 157 cmt. d. In this case the only significant contacts are with New York and California. As noted in Part III.A.1. *supra,* the conduct regulation-loss allocation dichotomy is a proxy for the balancing of competing state interests.

California's interest is much greater than New York's. New York does have an interest in ensuring its domiciliaries' safety on their out-of-state travels and in seeing them compensated for out-of-state injuries. This interest must be balanced against California's stronger, more immediate interest in physically protecting those who travel or reside there. In addition, two factors to be considered by a court in making a choice of law determination are "the needs of the interstate and international systems." *See* Restatement (Second) of Conflict of Laws § 6(2)(a), and "the protection of justified expectations." *Id.* at § 6(2)(d). Both of these factors are implicated here and militate in favor of the application of California law to the California shooting.

New Yorkers traveling outside the United States rely on the federal government, rather than New York, for protection. When traveling inside the United States, however, they assume that each state through which they pass will protect any person within its borders, whether or not he is a resident. This conclusion is buttressed by the Equal Protection Clause— which prohibits discrimination against out-of-staters, and protects the fundamental right of all Americans to travel from state to state—by the "dormant" Commerce Clause, and by the mutual sense of concern Americans have for each other. *See, e.g., Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (discrimination by a state against out-of-staters violates the Equal Protection Clause); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)(striking down one-year waiting-period for receipt of welfare benefits as unconstitutional interference with freedom of interstate travel); *Wyoming v. Okla-*

*homa,* 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (Oklahoma statute requiring Oklahoma-based coal-fired electric generating plants to use at least 10% Oklahoma-mined coal unconstitutionally burdensome on interstate commerce). Nondomiciliaries voluntarily traveling through a state justifiably depend on that state's civil and criminal laws—reflecting that state's policy judgments as to which conduct is punishable and which injuries compensable—for protection.

A state in which a nonresident is shot and killed or wounded has an interest at least as acute as that of the person's domicile in vindicating its laws providing for physical protection, whether civil or criminal. The danger of criminal misuse of guns loose within a state arguably gives rise to an intense state interest in the matter since all persons within the state's lines—residents and nonresidents alike—are at risk. Disregarding the shooting state's interest in favor of that of plaintiff's domicile will interfere with the smooth functioning of the interstate system in which each state provides for the physical safety of those living in or traveling through it.

In the instant case, the state of the shooting is also the place where the gun was found. There is no claim that this gun came from or was destined to go to New York. The police investigation of the homicide and the related criminal prosecution were California's responsibility.

The police and criminal powers of the state of the shooting are designed to protect against killings of this kind. The civil and criminal justice systems work hand-in-glove to provide the necessary local peace keeping atmosphere. Consideration of these factors compels the conclusion that California law should govern the suit arising from a shooting occurring within its borders.

A public policy exception to the application of California law would be inappropriate. No "deeply rooted tradition of the common weal" is at issue. *See Cooney,* 81 N.Y.2d at 79, 612 N.E.2d at 285, 595 N.Y.S.2d at 927. The case deals not with settled matters fundamental to New York policy, but with the cutting edge of tort law. *See id.* (rejecting public policy exception where conflict concerned rules "introduced into our law only relatively recently"). Given the unsettled state of the law of both states, no established policy of New York is involved.

■ Renvoi need not be considered because California law also governs under California's choice of law rules. California follows a three-step "governmental interest" analysis which asks: (1) whether the substantive rules of the two jurisdictions conflict, (2) whether this conflict implicates legitimate policy interests of the competing jurisdictions, and (3) which state's policy interest would be more impaired if its law were displaced by that of the other jurisdiction. *See, e.g., Arno v. Club Med, Inc.,* 22 F.3d 1464, 1467–68 (9th Cir.1994); *Vestal v. Shiley, Inc.,* No. SACV96–1205, 1997 WL 910373, at *1–3 (C.D.Cal. Nov. 17, 1997); Symeonides et al., *Conflict of Laws, supra,* at 286–88 (table; California uses interest analysis in combined modern form in torts).

Following this approach, California courts apply foreign law where California's contacts with the parties or events are insufficient to implicate its interests or where doing so would favor a California litigant. *See, e.g., McGhee v. Arabian American Oil Co.,* 871 F.2d 1412, 1422 (9th Cir.1989) (where suit was by California resident against Saudi employer for injuries suffered in Saudi Arabia, California's interest insufficiently implicated to warrant application of California law); *Vestal,* 1997 WL 910373 (North Carolina law favoring California defendant applied in suit by nonresidents for injuries sustained out of state); *Greer v. Academy Equipment Rentals,* No. C94 0120, 1994 WL 443421 (N.D.Cal. Aug. 11, 1994) (California's strong interest in protecting its residents

from having to defend suits that would be stale by California's standards predominated in suit by non-resident based upon Nevada injury). The instant case involves no California claimants but does concern California's legitimate interest in securing the physical safety of visitors and residents. This interest is superior to New York's purely compensatory stake. In these circumstances, it is unlikely that California's conflicts rules would refer the matter back to the substantive law of New York. There is thus no need to consider applying New York's law in order to avoid a renvoi cycle.

### c. Effect of Parties' Stipulation

■ Prior to the severance of *Johnstone v. Accu-tek, et al.*, the parties had proceeded on the assumption that New York law applied to Ms. Johnstone's California-based claims. Defendants now argue that the parties' apparent agreement on this point amounts to a binding stipulation which the Court has no discretion to override. Plaintiffs have not made their position clear.

In commercial cases the parties' choice of law is generally favored since it eliminates one source of contention and uncertainty. Contractual choice of law provisions "will be honored as long as the jurisdiction chosen has a substantial relationship to the parties or their performance and fundamental policies of New York law are not violated." *See Yankee Caithness Joint Venture, LP v. Planet Ins. Co.*, No. 94 CIV. 8939, 1996 WL 426359, at *2 (S.D.N.Y. July 30, 1996) (citing Woodling v. Garrett Corp., 813 F.2d 543, 551 (2d Cir.1987)); *see also 5-Star Management, Inc. v. Rogers*, 940 F.Supp. 512, 520 (E.D.N.Y.1996); Restatement (Second) of Conflict of Laws § 187(2). Parties to contracts arising out of transactions covering at least $250,000 may choose to be governed by New York law "whether or not such contract, agreement or undertaking bears a reasonable relation to this state." *See* N.Y. Gen. Oblig. Law § 5–1401 (McKinney 1989). Courts applying New York law have not differentiated between contractual choice of law clauses and post-incident choice of law stipulations, tending also to honor the latter, whether they are express or implied. *See, e.g., American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997) ("where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry"); *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989) (where parties' briefs relied on New York law, court applied New York law "under the principle that implied consent to use a forum's law is sufficient to establish choice of law"); *Robbins v. Ogden Corp.*, 490 F.Supp. 801, 806 n. 2 (S.D.N.Y.1980) (upholding parties' stipulated choice of New York law where New York had significant contacts with case). *But see Ezell v. Hayes Oilfield Const. Co.*, 693 F.2d 489, 492 n. 2 (5th Cir.1982) (distinguishing between contractual choice of law provisions, enforceable under Louisiana law, and pretrial choice of law stipulations, which are "no more binding on us than any pretrial stipulation as to the content of Louisiana law"); *Consolidated Water Power and Paper Co. v. Spartan Aircraft Co.*, 185 F.2d 947, 949 (3d Cir.1950) ("no stipulation made after litigation has begun as to the law which is to determine it has ever been upheld as far as we know, nor do we think it likely to be").

■ This approach is in keeping with the New York courts' policy of enforcing stipulations which are "not unreasonable, not against good morals or sound public policy . . . ." *Matter of New York, Lackawanna & Western R.R. Co.*, 98 N.Y. 447, 453 (1885); *see also Nishman v. DeMarco*, 430 N.Y.S.2d 339, 344–47, 76 A.D.2d 360, 366–71 (2d Dep't 1980) (discussing judicial policy favoring enforcement of stipulations as to a wide variety of matters); 2A Harold L. Korn, et al. *New York Civil Practice* § 2104.02 (1994) (same). New York law treats stipulating litigants like other contracting parties, permitting them "free[dom] to mold the contours of their

lawsuit within broad parameters." *Nishman*, 76 A.D.2d at 369, 430 N.Y.S.2d at 345. The same does not hold true, however, where the results of this private ordering would (1) violate public policy, *see, e.g., Gullo v. Gullo*, 46 A.D.2d 991, 361 N.Y.S.2d 769 (4th Dep't 1974) (stipulation of divorce in violation of New York's domestic statutes not enforceable); *In re Flanagan's Estate*, 262 A.D. 903, 28 N.Y.S.2d 818 (2d Dep't 1941) (refusing enforcement of stipulation disruptive of orderly procedure); (2) purport to circumscribe the court's jurisdiction, *see, e.g., People v. Eisenberg*, 100 Misc.2d 29, 420 N.Y.S.2d 962 (1st Dep't 1979) (stipulation purporting to limit court's jurisdiction was a nullity); or (3) operate to the disadvantage of non-parties. *See, e.g., Hong Kong & Shanghai Banking Corp. v. HFH USA Corp.*, 805 F.Supp. 133, 140 (W.D.N.Y. 1992) ("Where the rights of third parties are implicated, the court should be governed by the ordinary rule that the federal district courts apply the choice of law rules of the state in which they sit."). Courts decline to enforce parties' stipulations in these circumstances because honoring them would enable litigants to enter into binding agreements with adverse consequences reverberating beyond the area bounded by their private interests.

To give effect to the parties' apparent agreement that New York law governs Ms. Johnstone's claims would have detrimental far-reaching effects. As already noted, California's paramount interest in having its law applied to this case predominates over that of New York. At issue is California's stake in the development of its civil law for the general physical safety and benefit of its visitors and residents. In a pivotal case like this one, involving uncharted areas of tort law and implicating issues of both national and state policy, a binding choice of law stipulation by the parties is inappropriate.

Applying New York law will deprive future litigants suing in the California courts over California shootings of legal precedent in this area. The orderly development of the common law by the states should not be hampered by the arbitrary application of rules chosen by the parties.

Choice of law stipulations in tort actions are permissible. *See e.g., Von Hundertmark v. Boston Prof'l Hockey Ass'n*, No. CV–93–1369, 1996 WL 118538, at *4 (E.D.N.Y. March 7, 1996); "[T]here is no express prohibition against parties stipulating as to choice of law in tort actions." *Lloyd v. Loeffler*, 694 F.2d 489, 495 (7th Cir.1982) ("reasonable stipulations of choice of law are honored in contract cases, and we do not see any reason why the same principle should not apply in tort cases" (citation omitted)). The unwritten practice at the district level in this circuit does appear to be to encourage stipulations as to choice of law in tort cases in order to reduce the cost of litigation. Some courts appear to give effect to such stipulations only after analyzing them for consistency with New York's choice of law rules. *See, e.g., Solow v. Stone*, 994 F.Supp. 173, 176 (S.D.N.Y.1998) (parties' agreement upheld where it comported with New York choice of law rules concerning director and officer liability); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1372 (E.D.N.Y.1988) (enough contacts with New York to warrant honoring parties' stipulation choosing New York law); *Lawlor v. Gallagher Presidents' Report, Inc.*, 394 F.Supp. 721, 726 (S.D.N.Y.1975) (where all parties agreed that New York law applied, court applied New York law "since New York appears to have the most significant contacts with the issues and the parties and the greatest interest in having its law apply"); *cf. Von Hundertmark*, 1996 WL 118538, at *4 (accepting choice of law stipulation between tort litigants where parties made a reasoned choice that did not harm an unrelated but interested individual).

In other cases, choice of law stipulations have been upheld without any discussion. *See, e.g., Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 203 n. 7 (2d Cir.1998); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d

Cir.1995); *Flamm v. American Ass'n of Univ. Women*, 28 F.Supp.2d 185 (S.D.N.Y. 1998); *Birnbaum v. United States*, 436 F.Supp. 967, 976 (E.D.N.Y.1977). In each of these cases the court appropriately honored the parties' agreement that New York law govern. In contrast to the instant case, the issue of which state's law applied had no wider impact beyond the litigants' private concerns, and no other state had a greater interest than New York in having its law applied. *See Hannex* (commercial tort case with contacts in many jurisdictions); *Stagl* (injuries sustained in New York); *Flamm* (suit by New York domiciliary over defamation published nationwide); *Birnbaum* (tortious conduct took place in New York).

Defendants also rely on the application of New York substantive law in evaluating the viability of plaintiffs' claims in connection with the California bankruptcy proceedings of Lorcin, Inc., one of the original defendants. There is no indication that the courts in the bankruptcy proceedings gave the choice of law issue any serious consideration. Whatever collateral estoppel effect the bankruptcy proceeding may have had is of limited and non-controlling significance since the procedures available and the incentives to litigate vigorously or to analyze the law were significantly different. Symeonides et al., *supra*, at 745.

Given California's pressing interest in having its law applied to shootings within its borders, the parties' stipulation that New York law governs is not binding.

### 2. *Costa v. Accu-tek, et al.*

 The parties are in disagreement over which state's law—that of New York or Virginia—governs the Virginia shooting of Christopher Malachi. Application of either state's law would be neither arbitrary nor fundamentally unfair. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). Mr. Malachi was a New York domiciliary as was his mother, plaintiff Veronica Costa. *See Hamilton v. Accu–Tek*, 13 F.Supp.2d

366 (E.D.N.Y.1998). The shooting took place in Virginia, where Mr. Malachi had lived for approximately four years.

As was the case with California law, conflicts between New York and Virginia law, while not susceptible of precise delineation, are highly likely. Virginia's tort law is generally more favorable to manufacturers than is New York's. *See, e.g., Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 374 S.E.2d 55, 57 n.4 (1988) ("Virginia law ... does not permit tort recovery on a strict-liability theory in products liability cases."); *Richmond, Fredericksburg & Potomac R.R. Co. v. Davis Indus., Inc.*, 787 F.Supp. 572, 575 (E.D.Va.1992) ("Strict liability for use of a product cannot be imposed on the manufacturer. To hold otherwise converts the manufacturer into an insurer."); *Ford Motor Co. v. Bartholomew*, 224 Va. 421, 297 S.E.2d 675, 680 (1982) (plaintiff's contributory negligence is a complete bar to recovery from manufacturer). In addition, Virginia does not appear to recognize any of the theories of collective liability adopted by the New York courts. *See generally Hymowitz*, 73 N.Y.2d at 504–06, 539 N.E.2d at 1073–75, 541 N.Y.S.2d at 945–47.

Whether the potential conflicts are characterized as loss allocating or conduct regulating is immaterial. The law of the place of injury applies either way. No public policy exception is appropriate.

If anything, the shooting of Mr. Malachi presents an even more compelling argument than the Johnstone shooting for choice of foreign law over that of New York. Mr. Malachi's contacts with Virginia were much more extensive than those of Mr. Johnstone with California. He had lived in Virginia for four years and carried a Virginia driver's license and identification card. *Hamilton v. Accu-Tek*, 13 F.Supp.2d 366, 368 (E.D.N.Y.1998). The fact that the law of Virginia might not recognize the plaintiffs' negligent merchandising claim does not diminish Virginia's interest in the matter. Virginia, like

every other state, has a keen interest in regulating conduct by imposing liability for harm occurring within its borders. In so doing, it is entitled to strike its own balance between compensating those who suffer injury and protecting the interests of commerce. New York's interest in seeing its domiciliaries compensated for harm suffered while traveling out of state cannot trump Virginia's interest without interfering with the smooth working of the interstate system. *See* Restatement (Second) of Conflict of Laws § 6(2)(a) cmt. d (1971) ("Probably the most important function of choice-of-law rules is to make the interstate and international systems work well .... In formulating rules of choice of law, a state should have regard for the needs and policies of other states and for the community of states.") In addition, given Mr. Malachi's long residence in Virginia, it is fair to conclude that choice of Virginia law would be in line with the parties' justified expectations. *See id.* § (6)(2)(d).

Analysis under Virginia's conflicts rules does not yield a contrary result. In torts conflicts, Virginia adheres to the traditional rules of *lex loci delicti* "as to all matters going to the basis of the right of action itself," *Jones v. R.S. Jones & Assocs.*, 246 Va. 3, 431 S.E.2d 33, 34 (1993), while the law of the forum "controls all that is connected merely with the remedy." *Id.* Virginia's choice of law rules apply the substantive law of the place of the wrong and the procedural law of the forum. *See id.* at 5, 431 S.E.2d at 34 (statute of limitations for wrongful death deemed "procedural"); *Milton v. IIT Research Inst.*, 138 F.3d 519 (4th Cir.1998) (applying law of place of wrong in wrongful discharge action). Because none of the potentially conflicting laws—even those concerning the imposition of collective liability—may be characterized as solely procedural or compensatory, *see Part* IV.A.1.b., *supra*, the law of the place of the tort, in this case Virginia, governs. Here again, there is no need to consider renvoi since Virginia's conflicts rules do not refer back to New York substantive law. *See* Symeonides et al., *supra*, at 287 (table; Virginia uses traditional place of last contact analysis).

## B. Transfer

### 1. Convenience of Parties and Witnesses

██ Plaintiffs, as New York domiciliaries, will be inconvenienced by having to prosecute the suit in a non-New York forum. The resulting inconvenience to defendants should be minor. They have already benefitted from consolidated discovery. In view of the severance of *Costa v. Accu-tek et al.* and *Johnstone v. Accu-tek, et al.*, defendants would already be put to the expense and inconvenience of mounting a second defense even without transfer. They will thus only be burdened to the extent that defending out of state would be more costly and cumbersome. Witnesses will be inconvenienced to the extent they live closer to New York than to Virginia or California. There may be some witnesses and defendants for whom transfer will entail less of a burden since the police inquiry in each state was extensive and uncovered a number of local witnesses.

### 2. Plaintiffs' Choice of Forum

Courts vary in their assessment of the weight to be accorded the plaintiffs' choice of forum in deciding whether to transfer under Section 1404(a). *Compare Miller v. County of Passaic*, 699 F.Supp. 409, 411 (E.D.N.Y.1988) (this factor is entitled to "great weight") *with Hernandez v. Graebel Van Lines*, 761 F.Supp. 983, 990 (E.D.N.Y. 1991) ("since the result under section 1404(a) is that the action is merely transferred and not dismissed as with a *forum non conveniens* motion, the plaintiff's choice of forum is not accorded any great significance in the analysis"). In general, courts try to defer to the plaintiff's choice of forum. This factor, however, like the others is not dispositive and should not be given undue consideration, particularly where, as here, the compelling interests of

another jurisdiction favor transfer. *See, e.g., Cain v. New York State Bd. of Elections,* 630 F.Supp. 221, 227 (E.D.N.Y.1986) (significance of plaintiff's choice of forum reduced where transactions or facts giving rise to action have no material connection to plaintiff's chosen forum).

### 3. Practical Considerations

The most extensive sources of evidence relevant to the shootings—including testimony of investigating officers and ballistics evidence—are located in Virginia and California. To the extent that the parties intend to rely on physical evidence and testimony connected to local law enforcement investigations, transfer to Virginia and California will promote ease of access. By contrast, the availability of evidence and witnesses respecting damages will be more readily accessible in plaintiffs' New York domicile where relatives, friends and records are likely to be. It should be noted that Mr. Johnstone died in New York approximately one month after the shooting. The desirability of transfer is thus neither enhanced nor diminished by this factor.

### 4. Interest in Local Adjudication

The public interest in local adjudication of local controversies favors transfer of these actions to the states where the shootings occurred. *See, e.g., In re Eastern Dist. Repetitive Stress Injury Lit.,* 850 F.Supp. 188, 195 (E.D.N.Y.1994) ("When an action involves injuries sustained in a particular locale, the public interest supports adjudication of the controversy in that locale, where it may be a matter of local attention, rather than in a remote location where it will be learned of only by report."); *Kolko v. Holiday Inns, Inc.,* 672 F.Supp. 713, 716 (S.D.N.Y.1987) ("The public interest requires that 'localized controversies [be] decided at home.'" (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947))). The questions of liability and damages for conduct with local consequences are most appropriately put to local juries. Particularly in a highly controversial case like this

one, where the standards of care are likely to vary from jurisdiction to jurisdiction, the assessment of the unreasonableness of the risk posed by defendants' acts is better made by those whose physical safety is concerned. This factor weighs heavily in favor of transfer to the shooting state.

### 5. Familiarity with Applicable Law

A federal court sitting in diversity is more likely to be aware of the subtleties of state law in the state in which it sits. For this reason, lack of familiarity with governing law generally favors transfer. *See, e.g., In re Eastern Dist. Repetitive Stress Injury Lit.,* 850 F.Supp. at 196 (transfer to court sitting in the state whose law will be applied especially appropriate in products liability area, where law varies significantly from state to state); *Fontana v. E.A.R.,* 849 F.Supp. 212, 215 (S.D.N.Y.1994) (likelihood that Wyoming law would apply under New York's choice of law rules was factor favoring transfer); *Hall v. E.I. Du Pont De Nemours & Co.,* 345 F.Supp. 353, 385 (E.D.N.Y.1972) (familiarity with applicable local law a consideration in transfer inquiry); 15 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 3854, at 466 (2d ed.1986).

This factor assumes greater importance in cases involving unsettled areas of the law. *See, e.g., Schmid Lab., Inc. v. Hartford Accident & Indemnity Co.,* 654 F.Supp. 734, 737 n. 11 (D.D.C.1986) ("The benefit of having a local court construe its own law is a relevant factor in considering a transfer motion. This consideration is properly given greater weight when the applicable state law is unclear." (citations omitted)). Where, as here, state law is still developing and a firm grasp of these developments is required in order to predict how a state's highest court would rule, the federal courts of the shooting states are better equipped to grapple with the substantive legal issues than are the courts of New York.

### 6. Interests of Justice

Ultimately, the balance is strongly in favor of a transfer to the state of the shooting for reasons peculiar to the case at hand. The only factors clearly weighing in favor of retention of the action in New York are plaintiffs' inconvenience and easy access to witnesses and evidence relating to damages. Yet, the public interest in local adjudication of these controversies and the forum court's familiarity with the applicable law weigh strongly in favor of transfer. Considering the totality of the circumstances, the interests of justice will best be served by transfer of the cases arising out of the Virginia and California shootings to the district courts sitting in those states. No party has suggested that the cases could not originally have been commenced in those states. *Cf. Chance v. E.I. Du Pont De Nemours & Co.*, 371 F.Supp. 439, 450–51 (E.D.N.Y.1974) (analyzing defendants' amenability to suit in transferee states).

## V. CONCLUSION

The net of this conflicts of law decision, plus an earlier decision finding jurisdiction, is that New York's expansive law of jurisdiction applies to this case, *see Hamilton v. Accu-Tek*, 32 F.Supp.2d 47 (E.D.N.Y. 1998), while, as to some plaintiffs, the probably more restrictive substantive law of another state governs. There is no decisive reason why, applying standard analysis, the jurisdiction and choice of law issues should be governed by the same state's law. Nor is it necessary that "the judicial jurisdiction test ... be more demanding than the choice of law test ...." Symeonides, et al., *supra*, at 698.

There is no anomaly in finding that New York courts have jurisdiction, but that, applying standard venue and choice of law rules, the courts of another state will be more likely to effectively deal with the substantive case, requiring determination and application of that state's substantive law. Rules of jurisdiction, venue, choice of law and the detailed practice under the Federal Rules of Civil Procedure all play an integrated role in ensuring due process and the vindication of public policy.

Under New York's choice of law rules, the laws of Virginia and California apply to *Costa v. Accu-tek et al.* and *Johnstone v. Accu–tek et al.*, respectively. In view of the unsettled state of the applicable state law, the desirability of trial by the district court most familiar with the relevant legal developments and subtleties and thus best equipped for the task, and the strong public interest in the adjudication of local disputes in the jurisdiction in which they arise, these cases are transferred to the respective federal districts where each shooting occurred.

Submit transfer orders on notice within ten days.

So ordered.